UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERTO ELORREAGA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ROCKWELL AUTOMATION, INC., et al.,<br><br>Defendants. | Case No. 21-cv-05696-HSG<br><br>**ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 123, 125, 129, 130, 131 |

Pending before the Court are motions for summary judgment, filed by Plaintiffs and Defendants General Electric Company; ViacomCBS Inc.; Air & Liquid Systems; and Warren Pumps, LLC. Dkt. Nos. 123, 125, 129, 130, 131. The Court finds these matters appropriate for disposition without oral argument and the matters are deemed submitted. *See* Civil L.R. 7-1(b). For the reasons detailed below, the Court **DENIES** Defendants' motions for summary judgment and **GRANTS** Plaintiffs' motion for partial summary judgment.

**I.   BACKGROUND**

Roberto Elorreaga initially brought this lawsuit in the Superior Court of San Francisco, alleging that he developed malignant pleural mesothelioma from exposure to asbestos-containing products or equipment while working aboard United States Naval vessels and in Naval shipyards. *See* Dkt. No. 1-1, Ex. A; Dkt. No. 1-1, Ex. B. Mr. Elorreaga passed away in October 2021, Dkt. No. 55, and his wife and sons, Plaintiffs Rosemary Elorreaga, Robert Paul Elorreaga, Richard Andrew Elorreaga, and Ronald Edward Elorreaga, continue to pursue this case, Dkt. No. 66 ("SAC"). Plaintiffs allege that Defendants either manufactured or supplied the asbestos-containing equipment with which Mr. Elorreaga worked. *Id.*

As relevant to these motions, Mr. Elorreaga served aboard the *USS Rupertus* (DD-851)

from October 1959 to January 1960 as a machinist mate, and the *USS Cowell* (DD-547) from October 1960 until February 1963 as a fireman's apprentice and then as an electrician's mate. Dkt. No. 130-6, Ex. D at 3–6 (ll. 31:13–32:9, 34:4–18, 129:6–8).

## II. LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.* But in deciding if a dispute is genuine, the court must view the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008). If a court finds that there is no genuine dispute of material fact as to only a single claim or defense or as to part of a claim or defense, it may enter partial summary judgment. Fed. R. Civ. P. 56(a).

## III. DISCUSSION

### A. Government Contractor Defense

As an initial matter, Defendants argue that they are entitled to summary judgment based on the preemptive government contractor defense outlined in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988). *See* Dkt. Nos. 129 at 13–18; Dkt. No. 125 at 14–16; Dkt. No. 130 at 16–24. In short, Defendants contend that the Navy is responsible for any asbestos exposure because they simply complied with its specifications when supplying any asbestos-containing materials. Plaintiffs, for their part, argue that the government contractor defense does not apply here, and seek partial summary judgment on this issue. *See generally* Dkt. No. 131.

The government contractor defense "protects government contractors from tort liability that arises as a result of the contractor's 'compli[ance] with the specifications of a federal government contract.'" *Getz v. Boeing Co.*, 654 F.3d 852, 860 (9th Cir. 2011) (quoting *In re*

2

1  *Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1000 (9th Cir. 2008)). "Stripped to its

2  essentials," under this defense, the contractor asserts that "[t]he Government made me do it." *In*

3  *re Hawaii Federal Asbestos Cases*, 960 F.2d 806, 813 (9th Cir. 1992) (quotations omitted). To

4  establish the defense, a contractor must show:

> (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Boyle* , 487 U.S. at 512. The defendant bears the burden of establishing this affirmative defense, and at the summary judgment stage, the defendant must do so in a way that "no reasonable jury could fail to find that the defense ha[s] been established." *Snell v. Bell Helicopter Textron*, 107 F.3d 744, 746 (9th Cir. 1997).

### i. Application to Federal Claims

Plaintiffs first contend that the government contractor defense does not apply to federal claims. *See* Dkt. No. 131 at 1–2, 17–19. Because they bring claims under federal maritime law, they urge that Defendants may not rely on this defense. *Id.* Despite the age of *Boyle*, the parties have not cited—and the Court has not found—a case directly addressing whether the defense may apply to federal claims.

A brief overview of *Boyle* is instructive. As Plaintiffs point out, in *Boyle* itself the Supreme Court only addressed whether the defense applied to state law claims. *See id.* at 16–17; *see Boyle*, 487 U.S. at 512, n.5. A Marine helicopter copilot died after his helicopter crashed into the ocean during a training exercise. *Id.* at 502. Although the copilot survived the crash, he could not open the helicopter's escape hatch and drowned. *Id.* The copilot's father filed suit under Virginia law against the contractor that built the helicopter, alleging that it had defectively repaired part of the flight control system and had defectively designed the escape hatch. *Id.* at 502–03. The jury awarded the father $725,000, but the Court of Appeal reversed and remanded, finding that as a matter of law the company could not be held liable due to the "military contractor defense." *Id.* at 503. The Supreme Court considered whether such immunity should apply to

3

protect government contractors from state tort liability for design defects. *Id.* at 504–14.

The Supreme Court framed the question as one of preemption. *See id.* at 504. The Court explained:

> In most fields of activity, to be sure, this Court has refused to find federal pre-emption of state law in the absence of either a clear statutory prescription or a direct conflict between federal and state law. But we have held that a few areas, involving "uniquely federal interests," are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law of a content prescribed (absent explicit statutory directive) by the courts-so-called "federal common law."

*Id.* at 504 (citations omitted). The Court found that procurement contracts such as the one involved in *Boyle* invoked "uniquely federal interests," and that there was a risk of "significant conflict" between these federal interests and state law in this context. *Id.* at 507–14.

Specifically, under the Federal Tort Claims Act, damages cannot be recovered against the United States for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government whether or not the discretion involved be abused." *See id.* at 511 (citing 28 U.S.C. § 2680(a)). Because "the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function," the Supreme Court explained that the FTCA would insulate government officials from liability for defective equipment design. *Id.* But they concluded that "[i]It makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production." *Id.* at 512.

The dissent in *Boyle* argued that Congress—not the Court—has the power to fashion such a defense. *See id.* at 515–19 (Brennan, J., dissenting). The dissent also questioned how state tort law could conflict with federal law since the Death on the High Seas Act ("DOHSA") "would provide a tort suit, but no (at least no explicit) Government-contractor defense, against the same designer for an accident involving the same equipment" if the accident had occurred further off the coast of Virginia. *Id.* at 529–30 (Brennan, J., dissenting). In response to this point, the majority

4

emphasized that "Justice Brennan's assumption that the outcome of this case would be different if it were brought under [DOHSA] is not necessarily correct." *Id.* at 512, n.5. Nevertheless, the Court explicitly reserved the question of whether the government contractor defense applies to federal claims too. *Id.*

Plaintiffs urge that the preemption concerns underlying *Boyle* do not apply in this case where they are suing Defendants under federal maritime law. *See* Dkt. No. 131 at 17–18. They also contend that the Ninth Circuit has, at least in dicta, agreed that the defense does not apply to federal claims. *Id.* In *Gomez v. Campbell-Ewald Co.*, the Navy contracted with the defendant to develop a recruitment campaign. *See* 768 F.3d 871, 873 (9th Cir. 2014), *aff'd but criticized*, 577 U.S. 153 (2016), *as revised* (Feb. 9, 2016). The plaintiff received an unsolicited text message encouraging him to join the Navy, and brought claims against the defendant under the Telephone Consumer Protection Act ("TCPA"). *Id.* at 873–74. The defendant claimed that it was entitled to derivative sovereign immunity under *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940).[1] *Id.* at 874. The plaintiff, for his part, had argued that *Yearsley* was "outdated" and that the district court should have applied the standard articulated in *Boyle*. *Id.* at 879. The Ninth Circuit concluded that *Yearlsey* was not applicable because it only "established a narrow rule regarding claims arising out of property damage caused by public works projects." *Id.* at 879–80. The Court also considered "the *Boyle* pre-emption doctrine," and concluded that it did not "provide [the defendant] with a relevant defense." *Id.* at 880.

The Court explained that "[a]lthough *Boyle* in effect created a defense for some government contractors, it is fundamentally a pre-emption case." *Id.* at 881; *id.* (rejecting "assumpt[ion] that *Boyle* represents a general grant of immunity for government contractors").

---

[1] Although Defendants do not raise a *Yearsley* defense in this case, a brief overview of the case may be helpful in understanding their *Boyle* defense and the parties' respective arguments. In *Yearsley*, a company entered into a contract with the federal government to build dams in the Missouri river to improve the navigation of the river. 309 U.S. at 19–20. The petitioners sought to recover damages after this process had washed away part of their land, arguing that the company had taken their land without just compensation in violation of the Takings Clause. *Id.* The Supreme Court held that as an agent of the government, the company could not be held liable because it had simply followed the government's instructions for the dam's construction, and thus "execut[ed] its will." *Id.* at 20–21. The petitioners could, however, seek compensation from the government. *Id.* at 21–22.

The defense "precludes state claims where the imposition of liability would undermine or frustrate federal interests." *Id.* at 880; *see also Nielsen v. George Diamond Vogel Paint Co.*, 892 F.2d 1450, 1454 (9th Cir. 1990) ("As we understand [*Boyle*], it is directed toward deciding the extent to which federal law should displace state law with respect to the liability of a military contractor."). The Court explained that the defense is thus "rooted in pre-emption principles and not in any widely available immunity or defense." *Id.* The Court reasoned that the plaintiff "brings a claim under federal law, so pre-emption is simply not an issue" and "[t]he *Boyle* doctrine is thus rendered inapposite." *Id.* The Court also pointed out that the defendant—despite having every incentive to raise applicable defenses—did not invoke *Boyle*, so "we need not belabor the present discussion—we accept [the defendant's] concession that *Boyle* is not relevant." *Id.*

In response, Defendants suggest that the reasoning in *Gomez* is wrong and not binding on this Court. *See, e.g.*, Dkt. No. 140 at 6–8. Defendants point out that even as it affirmed the Ninth Circuit in *Gomez*, the Supreme Court criticized the opinion. *See id.* at 7, n.8 (citing *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 167 (2016), *as revised* (Feb. 9, 2016)). But Defendants overread the Supreme Court's opinion in *Campbell-Ewald Co.*

In a footnote, the Supreme Court stated that "[w]e disagree with the Court of Appeals [in *Gomez*] to the extent that it described *Yearsley* as 'establish[ing] a narrow rule regarding claims arising out of property damage caused by public works projects.'" *Campbell-Ewald*, 577 U.S. at 167, n.7 (quoting *Gomez*, 768 F.3d, at 879). The Court explained that "[c]ritical in *Yearsley* was not the involvement of public works, but the contractor's performance in compliance with all federal directions" *Id.* However, the Court ultimately affirmed the Ninth Circuit. It explained that although "[g]overnment contractors obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States," this immunity "is not absolute." *Id.* at 166. The plaintiff had presented evidence that the Navy only authorized the marketing company to send text messages to people who had "opted in" to receive such messages, and the company had failed to follow these instructions. *Id.* at 168. The Supreme Court held that "[w]hen a contractor violates both federal law and the Government's explicit instructions, as here alleged, no 'derivative immunity' shields the contractor from suit by persons adversely affected by

6

1   the violation." *Id.* at 166.

2   Despite Defendants' urging that *Campbell-Ewald* somehow undermines the Ninth Circuit's
3   interpretation of *Boyle*, the Supreme Court did not question—or even address—that interpretation.
4   It only considered "derivative sovereign immunity" under *Yearsley*, which Defendants in this case
5   do not raise.  *Cf.* Dkt. No. 142 at 8 (Defendant Air & Liquid Systems Corporation recognizing that
6   *Yearsley* is "a separate defense of derivative immunity").

7   In a final effort to persuade the Court to disregard *Gomez*, Defendants list several cases in
8   which courts have considered the government contractor defense in the context of federal claims.
9   *See, e.g.*, *LaCourse v. PAE Worldwide Inc.*, 980 F.3d 1350, 1359 (11th Cir. 2020) (applying
10  defense to claims brought under DOHSA); *Pizarro v. Nat'l Steel & Shipbuilding Co.*, No. C 19-
11  08425 WHA, 2021 WL 1197467, at *3 (N.D. Cal. Mar. 30, 2021) ("[M]aritime law recognizes the
12  *Boyle* framework as a legitimate defense worthy of genuine analysis . . . ."); *Spurlin v. Air &
13  Liquid Sys. Corp.*, 537 F. Supp. 3d 1162, 1178, 1181 (S.D. Cal. 2021) (applying defense to claims
14  arising under federal maritime law); *Hammell v. Air & Liquid Sys. Corp.*, No.
15  CV1400013MASTJB, 2020 WL 5107478, at *7 (D.N.J. Aug. 31, 2020) (same); *Lund v. Crane
16  Co.*, No. 2:13-CV-02776-WGY, 2016 WL 2742383, at *2, *5 (C.D. Cal. May 10, 2016) (same);
17  *Nelson v. A.W. Chesterton Co.*, No. 10-00065, 2011 WL 6016990, at *1 (E.D. Pa. Oct. 27, 2011)
18  (same).  But critically, the parties in those cases did not appear to challenge the applicability of the
19  government contractor defense to federal claims, so the courts had no occasion to decide that
20  issue.  The courts simply applied the test without any analysis of the scope of *Boyle* or the fact that
21  the Supreme Court has said it is based on preemption concerns.

22  The Court understands Defendants' concern that the Ninth Circuit's interpretation of *Boyle*
23  may lead to disparate results depending on whether a plaintiff brings claims under state or
24  maritime law.  But in the absence of more direct authority, the Court is persuaded by the Ninth
25  Circuit's interpretation that *Boyle* is premised on preemption concerns that do not exist where, as
26  here, claims are brought under federal law.  *Cf. United States v. Montero-Camargo*, 208 F.3d
27  1122, 1132, n.17 (9th Cir. 2000) (en banc) (noting that "Supreme Court dicta have a weight that is
28  greater than ordinary judicial dicta as prophecy of what that Court might hold; accordingly, we do

7

not blandly shrug them off because they were not a holding" (quotation omitted)).  The Court accordingly finds that the government contractor defense under *Boyle* does not apply here because Plaintiffs' claims arise under federal maritime law.[2]  The Court thus **DENIES** Defendants' motions for summary judgment on this basis and **GRANTS** Plaintiffs' motion for partial summary judgment.

### B. Punitive Damages and Loss of Consortium

Defendants also argue that Plaintiffs are not entitled to either punitive damages or loss of consortium under federal maritime law.  *See* Dkt. No. 123 at 14–17; Dkt. No. 125 at 16–19; Dkt. No. 129 at 11–13.  The Court already addressed these arguments in its prior order granting in part and denying in part Defendants' motion to dismiss.  Dkt. No. 138.  As relevant here, the Court granted the Defendants' motion as to Plaintiffs' request for punitive damages and loss of consortium under general maritime law.  *Id.*  Defendants' arguments in their motions for summary judgment are therefore moot, and Plaintiffs' arguments are preserved for appeal.

### C. Causation

Lastly, and more substantively, Defendants argue that Plaintiffs lack sufficient evidence to establish that their products caused Mr. Elorreaga's mesothelioma.

Plaintiffs bear the burden of establishing that exposure to Defendants' products was a substantial contributing factor in causing Mr. Elorreaga's illness.  *See McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1174, 76–77 (9th Cir. 2016).  The Ninth Circuit has explained that "a party may satisfy the substantial-factor test by demonstrating that the injured person had *substantial exposure* to the relevant asbestos for a *substantial period of time*."  *Id.* at 1176 (emphasis added).  In other words, plaintiffs may proffer evidence regarding "the *amount* of exposure" or "the *duration* of such exposure."  *Id.* at 1176–77 (emphasis in original); *see also Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019) (explaining that proximate cause may be established with evidence that exposure to asbestos-containing product was

---

[2] In any event, even if Defendants had raised a *Yearsley* defense in this case or *Boyle* nevertheless applied, the Court is skeptical that summary judgment in Defendants' favor would be appropriate on this factual record.

8

"sufficiently sustained (or frequent) and intense") (quotation omitted). The Court contrasted such evidence with "[e]vidence of only minimal exposure to asbestos," which "is insufficient." *Id.* at 1176. "[T]here must be a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural." *Id.* (quotation omitted).

As this Court has acknowledged, "there are of course 'inherent practical difficulties, given the long latency period of asbestos-related disease,' in establishing causation from work performed several decades ago." *See In re Toy Asbestos*, No. 19-CV-00325-HSG, 2021 WL 1167638, at *5 (N.D. Cal. Mar. 26, 2021) (quoting *Rutherford v. Owens-Illinois, Inc.*, 16 Cal. 4th 953, 958 (Cal. 1997), *as modified on denial of reh'g* (Oct. 22, 1997)). Plaintiffs often lack direct evidence of causation, and often must rely on circumstantial evidence. Defendants urge that Plaintiffs lack sufficient evidence showing the amount or duration of Mr. Elorreaga's exposure attributable to any of their specific products, and that they are accordingly entitled to summary judgment in their favor.[3]

### i. Exposure to Asbestos

Defendants first argue that Plaintiffs lack evidence that Mr. Elorreaga was actually exposed to any asbestos from their products. In evaluating the parties' arguments, the Court considers the evidence in the light most favorable to Plaintiffs—as it must at this stage. *See Matsushita*, 475 U.S. at 587–88.

#### a. General Electric

Plaintiffs allege that Mr. Elorreaga was exposed to asbestos-containing electrical equipment from General Electric ("GE"), including control panels, "arc chutes," and cable. *See* Dkt. No. 148 at 1, 6–7, 18; *see also* SAC at ¶¶ 13–16. GE responds that Plaintiffs lack sufficient evidence to support this contention. *See* Dkt. No. 123 at 11–14.

---

[3] Defendants note that this case was initially filed in state court, and Mr. Elorreaga's deposition was first taken in 2020 before they were a part of the case. *See, e.g.*, Dkt. No. 130 at 1–3; Dkt. No. 165 at 2. However, Defendants do not dispute that they were provided copies of the transcripts from Mr. Elorreaga's prior deposition, or that Mr. Elorreaga sat for a "continuation" of his deposition in 2021 after they joined the case. *See* Dkt. No. 150-1 at ¶¶ 2–8; *see also* Dkt. No. 150-2, Ex. M. To the extent Defendants suggest that Plaintiffs' reliance on any of the 2020 depositions is improper, they did not file any evidentiary objections, and the Court declines to exclude this evidence *sua sponte*.

1      During his deposition, Mr. Elorreaga explained that as an electrician's mate on the *Cowell*,
2 he was responsible for working on the ship's electrical systems. Dkt. No. 148-2, Ex. A at 23–29
3 (ll. 54:10–57:9, 58:1–7, 59:12–20, 61:14–24, 76:5–8). He said this included control panels and
4 arc chutes manufactured by GE. *Id.*; *see also id.* at 37–38 (ll. 118:20–119:9) He said the arc chute
5 was the "major failure component," and he would have to clean the inside of these parts and also
6 replace them. *Id.* at 29–31 (ll. 65:14–24, 66:24–67:1). To clean an arc chute, he would use a
7 small wire brush to clean the contacts and remove large pieces that would stick to the components.
8 *Id.* at 30–31 (ll. 66:24–67:9). He would also use a rag or just blow off the dust inside. *Id.* This
9 work, he said, created dust. *See id.* at 50 (ll. 273:3–9).

10     Mr. Elorreaga described the arc chutes as "grayish" or dark in color, and hard like a
11 "Bakelite material." *See id.* at 34, 51 (ll. 75:7–9, 274:17–22). He also described them as "safety
12 devices" to protect components from the high heat and high currents in the system. *See id.* at 34–
13 35 (ll. 75:30–76:6). He would work on them frequently, and on a "regular maintenance schedule."
14 *Id.* at 52 (ll.276:5–15); *see also id.* at 33–34 (ll. 74:23–75:6). He said they would have visible dust
15 whenever he inspected them. *Id.* at 52–53 (ll. 276:17–277:11). Mr. Elorreaga recalled seeing the
16 GE name on the arc chutes, and he would install GE replacement chutes. *See id.* at 53 (300:19–
17 25); *see also id.*, Ex. B at 72 (ll. 161:10–18). He said the replacements were not interchangeable,
18 so they used arc chutes from the same manufacturer as the control box. *See id.*, Ex. A, at 32 (ll.
19 68:19–25).

20     Plaintiffs also presented indirect evidence regarding the asbestos content of the GE
21 products. According to GE's interrogatory responses, it manufactured products during the 1960 to
22 1963 timeframe that would have contained encapsulated chrysotile asbestos, including its
23 insulating Textolite material. *See* Dkt. No. 148-2, Ex. C at 82–85. One of GE's corporate
24 representatives, Thomas Tarka, testified that GE knew some of its products contained asbestos,
25 including some electrical distribution and control products. *See* Dkt. No. 148-2, Ex. D at 100–04
26 (ll. 44:19–24, 48:2–9, 50:25–51:4, 84:1–18). Plaintiffs' industrial hygienist expert, Mr. Jerome E.
27 Spear, also opined, based on Mr. Elorreaga's description of the GE products he worked with, that
28 the arc chutes and control panels were comprised of "transite," an asbestos cement material. *See*

10

Dkt. No. 148-2, Ex. I at 246–47 (¶¶ 14–16).

GE highlights the limitations of Plaintiffs' evidence. For example, Mr. Elorreaga did not explain how many "arc switches" were on the ships, or provide a precise estimate of how often he worked on them. *See* Dkt. No. 123 at 13 (citing Dkt. No. 123-3, Ex. A at 58:1–7, 60:20–61:1). GE also suggests that Mr. Elorreaga's work would not have disturbed any asbestos in the arc chutes. *Id.* Similarly, GE questions the strength of Plaintiffs' evidence that any of its products actually contained asbestos, and urges that Plaintiffs are attempting to displace their own burden. *See* Dkt. No. 167 at 2–3. Although certainly not overwhelming, the Court finds that Plaintiffs have proffered some evidence from which a reasonable jury could conclude that the products contained asbestos and that Mr. Elorreaga was exposed to it during the course of his work. GE will have ample opportunity to explore the strength of Plaintiffs' evidence at trial, including the nature of the GE products with which Mr. Elorreaga worked. However, it is not the Court's role at this stage to resolve such factual disputes.

### b. ViacomCBS

Plaintiffs allege that Mr. Elorreaga was also exposed to asbestos-containing products associated with Westinghouse electrical components and turbines.[4] *See* Dkt. No. 147 at 1–2, 5–8; *see also* SAC at ¶¶ 13–16. ViacomCBS responds that Plaintiffs lack sufficient evidence to support this contention. *See* Dkt. No. 125 at 8–10.

During his deposition, Mr. Elorreaga explained that he worked with Westinghouse electrical equipment, including control panels, on the *Cowell*. *See* Dkt. No. 147-2, Ex. A at 21, 23–24, (ll. 106:16–24, 109:14–20, 110:24–111:11); *see also id.*, Ex. B at 68, 87 (ll. 109:1–25, 664:6–665:2). He said that the control panel was labeled both on the outside with a plate and on the inside with a smaller label. *See id.*, Ex. A at 23–24 (ll. 110:24–111:11); *id.*, Ex. B at 69–70 (ll. 160:6–161:9). He also saw the name Westinghouse on the replacement arc chutes. *Id.*, Ex. B at 70 (ll. 16110–24, 277:18–278:8). Much like the GE electrical components discussed above, Mr. Elorreaga testified that he would open the control panels and clean the internal arc chutes, which

---

[4] ViacomCBS acknowledges that it is a "successor by merger to CBS Corporation (a Pennsylvania corporation f/k/a Westinghouse Electric Corporation)." *See* Dkt. No. 125 at 1., n.1.

created dust. *See id.*, Ex. A at 24, 50 (ll. 111:12–20, 272:14–274:5). Mr. Elorreaga also recalled a Bakelite material in the equipment. *See id.*, at 52 (ll. 274:17–22).

Additionally, Mr. Elorreaga explained that while working on the *Rupertus*, he recalled a Westinghouse propulsion turbine in the aft engine room. *See id.*, Ex. A at 28 (ll. 132:5–16); *see also id.*, Ex. C at 141–42 (ll. 84:15–85:21) (Westinghouse expert Roy C. Belanger explaining the turbines Westinghouse supplied for the *Rupertus*). The turbine's insulation blanket was marked with the name "Westinghouse." *See id.*, Ex. A at 39 (ll. 145:2–10). Although he did not personally participate in removing the insulation, Mr. Elorreaga testified that he was present and doing other work close by while the insulation was being removed and then reapplied. *Id.* at 31–38 (ll. 135:23–143:23.) He said this was a lengthy process and would have taken more than a day. *Id.* He explained the air was very dusty as a result, and he breathed it in. *Id.* at 49–50 (ll. 271:9–272:13).

Unlike some of the other products at issue in this case, Plaintiffs do not appear to argue that the Westinghouse turbines themselves contained asbestos. Rather, Plaintiffs argue that they required incorporation of asbestos-containing insulation in order to function properly. *See* Dkt. No. 147 at 1, 6–8. The Supreme Court has considered the scope of an equipment manufacturer's duty to warn of the dangers of asbestos from third-party components *See Air & Liquid Sys. Corp. v. DeVries*, 139 S. Ct. 986, 995 (2019). The Court concluded:

> In the maritime tort context, a product manufacturer has a duty to warn when (i) its product requires incorporation of a part, (ii) the manufacturer knows or has reason to know that the integrated product is likely to be dangerous for its intended uses, and (iii) the manufacturer has no reason to believe that the product's users will realize that danger.

*Id.* at 995.

Here, Westinghouse's corporate representative explained that the turbines required thermal insulation to function properly, and acknowledged that before 1970 the insulation included asbestos. *See* Dkt. No. 147-2, Ex. C at 104–106, 113 (ll. 23:23–26:3, 34:12–14). The designs for Westinghouse turbines included hooks and rails that were intended to hold this insulating blanket. *Id.* at 106–08 (ll. 26:12–13, 27:14–28:17). The Court finds this sufficient to satisfy prong one

1  under *DeVries*. ViacomCBS does not appear to meaningfully challenge Plaintiffs ability to

2  establish the second and third prongs under *DeVries*. *See* Dkt. No. 170 at 7–8. And in any event,

3  Plaintiffs have proffered some evidence to satisfy these prongs. *See id.*, Ex. H at 239; *id.*, Ex. A at

4  55 (ll. 301:15–25).

5      At bottom, ViacomCBS disputes the nature of Mr. Elorreaga's exposure to their products.

6  They state that he had only limited exposure to Westinghouse products, particularly the turbine,

7  and was unable to quantify his time spent with any specific product. The Court finds that at this

8  stage, Plaintiffs have presented sufficient evidence that Mr. Elorreaga was exposed to asbestos-

9  containing products from or attributable to Westinghouse. Defendants will be able to challenge

10  Plaintiffs' evidence directly at trial, but the Court may not weigh the relative persuasiveness of the

11  asserted facts at this stage.

12      **c. Warren**

13      Plaintiffs allege that Mr. Elorreaga was exposed to "asbestos-containing insulation and

14  gaskets" from Warren brand pumps. *See* Dkt. No. 150 at 5–6; *see also* SAC at ¶¶ 13–16. Warren

15  responds that Plaintiffs lack sufficient evidence to support this contention. *See* Dkt. No. 130 at 9–

16  11.

17      During his deposition, Mr. Elorreaga explained that he would perform maintenance on

18  pumps aboard the ships, including pumps connected to the steam propulsion system. Dkt. No.

19  150-2, Ex. B at 50 (ll. 27:4–20); *id.*, Ex. A at 32–35 (ll. 293:2–295:24, 297:3–24). On the

20  *Rupertus*, Mr. Elorreaga explained that he worked as a machinist mate on Warren pumps. *See*

21  Dkt. No. 150-2, Ex. A at 28–30 (ll. 215:4–218:12). He worked primarily in the two engine rooms.

22  *See id.*, Ex. B at 48–49 (ll. 21:13–22:5). He described replacing pumps that were connected to

23  high temperature and high pressure systems. *Id.* at 50 (27:4–10). To do so, he had to remove the

24  insulation from the outside of the pumps. *See id.*, Ex. A at 33–34 (ll. 294:24–295:4). He said the

25  air was "quite nasty" with visible dust when he did this, and he breathed it in. *See id.* at 34 (ll.

26  295:6–24). In order to fix any leaks, he would then have to remove the nuts and bolts, separate the

27  pump from the pipes, and remove the old gaskets. *Id.*, Ex. B at 50–52 (ll. 27:15–28:8, 29:17–20).

28  Mr. Elorreaga explained that he also worked on the "internals" of Warren pumps, and would have

United States District Court
Northern District of California

1    to take the pump itself apart to access an internal gasket. *Id.* at 51–52 (28:9–29:16). He would

2    use a wire brush to remove the gasket that was between the body and the head of the pump. *See*

3    *id.* at 53 (ll. 30:3–31:1). There was also packing material from the pumps. *See id.* at 55 (ll.

4    33:16–19). Doing so, he said, created visible dust. *See id.* at 53 (ll. 30:20–22). He would then

5    sweep this up to clean up afterward. *Id.* at 54–55 (ll. 31:13–32:14).

6    However, Mr. Elorreaga acknowledged that given his short time on the *Rupertus*, he likely

7    would have replaced the pumps only once. *Id.*, Ex. A at 29 (ll. 216:8–13). But he also said that as

8    an electrician's mate on the *Cowell* he would have to shut down the pumps in the engine room so

9    the machinists could work, and he was present right next to them while they did their work. *Id.* at

10   30, 35 (ll. 218:8–24, 297:3–24); *see also* Dkt. No. 130-7, Ex. E at 3 (ll. 214:5–215:20). Mr.

11   Elorreaga explained that he knew the pumps were Warren because "Warren" was stamped on the

12   pumps themselves. *See* Dkt. No. 130-7, Ex. E at 4 (ll. 219:15–25); *see also* Dkt. No. 150-2, Ex. B

13   at 56 (ll.34:13–35:1). At one point in his deposition, Mr. Elorreaga stated that he believed the

14   gaskets he worked with on Warren pumps were from Warren because they came in the same

15   packaging and the name was on the gaskets too. *See id.*, Ex. A at 36 (ll. 338:6–19); *see also id.*,

16   Ex. B at 58–59 (ll. 243:17–244:12). He also said that the gaskets were specific to the

17   manufacturer of the pump and not interchangeable. *See id.*, Ex. B at 55 (ll. 34:1–5).

18   Warren contends that Mr. Elorreaga's deposition testimony is vague. Dkt. No. 130 at 4, 9–

19   11. For example, Warren notes that Mr. Elorreaga could not identify what type of Warren pumps

20   he worked on or other physical characteristics in connection to the pump. *See* Dkt. No. 130-7, Ex.

21   E at 4–6 (ll. 216:22–217:11, 218:2–7, 220:9–16, 293:2–20). Warren also suggests that Mr.

22   Elorreaga's testimony is unreliable. For example, Mr. Elorreaga referenced working on what he

23   called a "bonnet gasket," but Plaintiffs' expert Captain Francis Burger, said he didn't know what

24   Mr. Elorreaga meant by this since bonnet gaskets are generally parts of valves and not pumps. *See*

25   *id.* at 3 (ll. 215:23–216:2); *see also* Dkt. No. 130-8, Ex. F at 28 (ll. 110:6–21).

26   Plaintiffs' argument is not a model of clarity. At times they appear to suggest that the

27   asbestos-containing insulation and gaskets were on the outside of the pumps. *See* Dkt. No. 150 at

28   ("Roberto Elorreaga was exposed to asbestos-containing insulation and gaskets *on* Warren

14

Pumps . . . ") (emphasis added); *id.* at 5 ("Mr. Elorreaga would replace gaskets and packing *on* pumps." (emphasis added). Elsewhere, they suggest that these were internal components of the pumps. *See id.* ("Plaintiffs have provided evidence to the asbestos-containing components *in* these products, and the dust that would have been generated from this work.") (emphasis added). But Mr. Elorreaga's deposition testimony does indicate that he worked on and around Warren pumps, including internal components. Warren's evidence challenging this testimony merely highlights the fundamentally factual dispute at issue here.

### d. Air & Liquid Systems

Like the Warren pumps, Plaintiffs also allege that Mr. Elorreaga was exposed to asbestos-containing insulation and gaskets associated with Buffalo Pumps.[5] *See* Dkt. No. 149 at 1, 4–6; *see also* SAC at ¶¶ 13–16. Air & Liquid Systems responds that Plaintiffs lack sufficient evidence to support this contention. *See* Dkt. No. 129 at 7–11.

Mr. Elorreaga testified that while serving on the *Rupertus*, he worked on Buffalo pumps in the engine rooms. *See* Dkt. No. 149-2, Ex. A at 27, 34–35 (ll. 221:21–230:11, 228:11–229:20, 298:2–8). He recalled the name "Buffalo" stamped on the pumps themselves. *See* Dkt. No. 149-2, Ex. A at 29–30 (ll. 223:19–224:8). He would remove and replace the gaskets on those pumps, although he never worked on any internal parts of the pumps. *See id.* at 30–32 (ll. 224:17–225:18, 226:10–17). He saw the word "Buffalo" on the packaging for the replacement gaskets. *See id.* at 35–36 (ll. 229:23–230:11); *see also id.*, Ex. B at 71–72 (ll. 39:17–40:13). Mr. Elorreaga explained that as part of his work, he would use a wire brush to clean out the debris between the head and body of the pump before replacing the gaskets, and that he would then clean up this debris afterward. *See id.*, Ex. B at 66–67 (ll. 30:3–32:19). He also recalled that while working on the *Cowell*, others would work on Buffalo pumps while he was present. *See id.*, Ex. A at 37–40 (ll. 231:19–234:8). Mr. Elorreaga further explained that the Buffalo pumps were insulated, and that insulation had to be removed during the course of the repairs to the pumps. *See id.* at 42 (ll. 296:1–25).

---

[5] Air & Liquid Systems Corporation acknowledges that it is a "successor by merger to Buffalo Pumps, Inc." *See* Dkt. No. 129 at 1.

1      Plaintiffs appear to argue that although the Buffalo pumps themselves may not have
2 contained asbestos, they required gaskets and packing to work properly, and those items contained
3 asbestos. *See* Dkt. No. 149 at 16–18. Plaintiffs offer little evidence explaining their theory, but
4 they do point out that Buffalo's person most knowledgeable indicated that the design of the pumps
5 provided for asbestos packing and gasket material. *See, e.g.*, Dkt. No. 142-2, Ex. C at 81–84 (ll.
6 57:20–60:9, 61:12–25). Buffalo also appears to admit that during the relevant timeframe in this
7 case, the gaskets and packing that it initially supplied with some of its pumps required and
8 therefore contained asbestos. *See id.*, Ex. D at 103–04. Although there may not be evidence that
9 these original materials were on the pumps in either the *Rupertus* or the *Cowell*, Mr. Elorreaga
10 testified about how these pumps require maintenance. Plaintiffs have therefore presented evidence
11 that Buffalo made its products with asbestos and knew that they would require replacement with a
12 similar part. *See DeVries*, 139 S. Ct. at 995. As with the other Defendants, the Court again finds
13 that this Defendant has not met its burden of showing that it is entitled to summary judgment on
14 this basis.

15      **ii.   Substantial Contributing Factor**
16      Defendants all argue that even if Plaintiffs have provided sufficient evidence that Mr.
17 Elorreaga was exposed to asbestos attributable to their products, that exposure was *de minimis* and
18 Plaintiffs cannot establish that this exposure was a substantial factor in causing Mr. Elorreaga's
19 mesothelioma. *See, e.g.*, Dkt. No. 130 at 11–15. In particular, Defendants appear to argue that
20 Mr. Elorreaga's testimony was not specific enough, meaning that Plaintiffs' experts do not have—
21 and cannot create—dose-specific information about their products. *See id.* at 13–16. As a result,
22 Defendants urge that these experts will inevitably provide causation testimony that every exposure
23 to asbestos is a substantial factor in causing mesothelioma (the "every exposure" theory). *Id.* The
24 Ninth Circuit in *McIndoe* rejected the "every exposure" theory, reasoning that it would "permit
25 imposition of liability on the manufacturer of any [asbestos-containing] product with which a
26 worker had the briefest of encounters on a single occasion." *See McIndoe*, 817 F.3d at 1177
27 (quotation omitted). As this Court has already determined, however, none of Plaintiffs' experts
28 appear to rely on an "every exposure" theory of liability. *See* Dkt. No. 193. The Court will not

16

1  reject their testimony on this basis, and Defendants obviously can challenge their opinions with
2  their own experts and on cross-examination. As the Court explained in its prior order, "[v]igorous
3  cross-examination, presentation of contrary evidence, and careful instruction on the burden of
4  proof are the traditional and appropriate means of attacking shaky but admissible evidence."
5  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993).

                \*     \*     \*

Although the evidence that Plaintiffs proffered is not especially strong, when viewed in the light most favorable to them, the Court finds that it is sufficient to raise at least one genuine dispute of material fact regarding: (1) whether Mr. Elorreaga was exposed to asbestos-containing products made, sold, or supplied by each Defendant; and (2) whether such exposure was a substantial factor in causing his disease.

## IV.  CONCLUSION

Accordingly, the Court **DENIES** Defendants' motions for summary judgment, Dkt. Nos. 123, 125, 129, 130, and **GRANTS** Plaintiffs' motion for summary judgment as to the government contractor defense. The Court further **SETS** a telephonic case management conference on May 2, 2023, at 2:00 p.m. All counsel shall use the following dial-in information to access the call:

Dial-In:  888-808-6929;

Passcode:  6064255

All attorneys and pro se litigants appearing for a telephonic case management conference are required to dial in at least 15 minutes before the hearing to check in with the courtroom deputy. For call clarity, parties shall NOT use speaker phone or earpieces for these calls, and where at all possible, parties shall use landlines.

//
//
//
//
//
//

17

The Court further **DIRECTS** the parties to meet and confer and submit a revised joint case management statement by April 25, 2023. The parties should be prepared to discuss how to move this case forward efficiently, including resetting the pretrial and trial dates.

**IT IS SO ORDERED.**

Dated: March 31, 2023

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge